69 So.3d 1014 (2011)
L.T., a juvenile, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D10-2678.
District Court of Appeal of Florida, Third District.
September 14, 2011.
Rehearing Denied October 4, 2011.
Carlos J. Martinez, Public Defender, and Brian L. Ellison, Assistant Public Defender, for appellant.
Pamela Jo Bondi, Attorney General, and Heidi Milan Caballero, Assistant Attorney General, for appellee.
*1015 Before WELLS, C.J., and RAMIREZ, JJ., and SCHWARTZ, Senior Judge.
WELLS, Chief Judge.
L.T., a juvenile charged with one count of providing false identification to a police officer in violation of section 901.36(1) of the Florida Statutes, appeals from an order denying his motion to dismiss and adjudicating him delinquent. While L.T. admits to having provided a false name to a law enforcement officer, he argues that he recanted well before any serious harm could occur. We agree and reverse.
The testimony at L.T.'s adjudicatory hearing was that on August 6, 2010, Miami Police Officer Alexander, while investigating an armed aggravated battery, spoke with the alleged victim and L.T.'s mother, who provided Officer Alexander with L.T.'s name and date of birth as well as a description of what he looked like, his tattoos, and what he was wearing when last seen. Police officers then proceeded to where they believed they might find L.T. and saw an individual who, based on the description given, they immediately knew to be L.T.:
Q Isn't it a fact that you knew that this person was L.T. because he matched the description given to you, a detailed description given to you?
A The clothing initially. But at first I didn't see his tattoos.
Q After looking at the tattoos, were you then able to identify this individual?
A Yes.
However, on questioning, L.T. told the officers his name was "William Clark."
L.T. was then taken into custody. As he was being taken to the police car for transport, L.T. and the arresting officers passed by L.T.'s mother who commented "oh, they got him." L.T. was read his Miranda rights and placed in the back seat of the police car. As the officers began filling out paperwork related to the arrest, L.T. provided his true identity.
At his trial for giving a false name to a law enforcement officer, L.T. argued that because he had informed the officers of his real name prior to any "serious harm," he had successfully recanted. See A.A.R. v. State, 926 So.2d 463, 466 (Fla. 4th DCA 2006) (confirming that the common law recantation defense is available in a section 936.01 false name prosecution). The State maintained that the defense was untenable once L.T. was arrested. See L.J. v. State, 971 So.2d 942, 943-44 (Fla. 3d DCA 2007) (concluding that on the facts of that case once the defendant was arrested the policy reasons underpinning the recantation defense no longer applied). Because the record confirms that the officers knew L.T.'s true identity almost immediately and before he was arrested, no "harm" was incurred by L.T. not recanting until shortly after he was arrested. See P.P. v. State, 466 So.2d 1140, 1141 (Fla. 3d DCA 1985) ("The undisputed evidence shows that the juvenile, in fact, gave his correct birthdate to Officer Masterrer who, in turn, placed this date in the arrest report. Prior thereto, the juvenile did give technically "false" birthdates to the officer, but those dates were, in fact, retracted before the officer made out his arrest report. Just as in perjury prosecutions where a defendant may recant his intentionally false testimony prior to the final submission of the case, Jones v. State, 400 So.2d 12 (Fla.1981); Carter v. State, 384 So.2d 1255 (Fla.1980); Brannen v. State, 94 Fla. 656, 114 So. 429 (1927); State v. Snipes, 433 So.2d 653 (Fla. 1st DCA 1983), so, too, one accused of obstructing justice, as here, should be able to retract any `false information' before it is officially recorded or does any harm. The underlying policy in both such cases is first, to encourage witnesses to tell the *1016 truth to the authorities and, second, the correlative need to induce such witnesses to correct, without fear of prosecution, their prior falsehoods before they have done any harm.").
We note that while an arrest may be a critical or essential factor in determining whether a false identification may be recanted, it is not alone determinative, and our decision in L.J. should not be read as so holding. In L.J., and the cases on which it relies in support of its holding, Fripp v. State, 766 So.2d 252 (Fla. 4th DCA 2000), and State v. Townsend, 585 So.2d 495 (Fla. 5th DCA 1991), the defendants' identities were unknown to the officers at the time the false information was provided. In L.J., a truant, twice gave false names to police officers causing them substantial work trying to identify him before he was arrested. In Fripp, an officer was substantially impeded in determining whether a traffic violator had a valid driver's license when twice given a false name. And, in Townsend, a traffic violator first refused to provide identification, then twice gave false identification before being arrested and then giving his real name.
In each of these cases, officers engaged in substantial efforts to ascertain the identity of the individuals involved before making an arrest and before the defendant recanted making the time of recantation in relation to the time of arrest the essential factor in determining whether this defense applied. See M.G. v. State, 989 So.2d 705, 708 (Fla. 1st DCA 2008), (holding that "the time of recantation in relation to the time of arrest is the essential factor in determining whether the affirmative defense of recantation applies"). Nothing similar occurred here. In this case, the officers knew L.T.'s identity almost immediately upon encountering him and the arresting officer testified that the false name given by L.T. impeded his investigation for about a second. On this record, L.T.'s motion to dismiss should have been granted.
The order under review is, therefore, reversed.